UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Jacqueline L. Waller,

> Plaintiff,

vs.                                                    REPORT AND RECOMMENDATION

Michael J. Astrue,[1]
Commissioner of Social
Security,

> Defendant.                    Civ. No. 06-3014 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision which denied her application for Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI"). The matter is now before the Court upon

the parties' cross-Motions for Summary Judgment. The Plaintiff has appeared by

Edward C. Olson, Esq., and the Defendant has appeared by Lonnie F. Bryan,

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, we have substituted him as the named Defendant.

Assistant United States Attorney.  For reasons which follow, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

## II.  Procedural History

The Plaintiff first applied for DIB, and SSI, on November 25, 2003, at which time, she alleged that she had become disabled on June 30, 2002.  [T. 29, 57-59, 76, 257-59].  The Plaintiff met the insured status requirement at the alleged onset date of disability, and remains insured for DIB through December 31, 2007.  [T. 29].

The State Agency denied the claims upon initial review, and upon reconsideration.  [T. 29-32].  The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on September 26, 2005, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by an attorney.  [T. 270-309].  Thereafter, on December 16, 2005, the ALJ issued a decision denying the Plaintiff's claim for benefits.  [T. 16-28].  On February 3, 2006, the Plaintiff requested an Administrative Review before the Appeals Council, [T. 12-13], which, on May 26, 2006, denied the claim for further review.  [T. 5-7].  Thus, the ALJ's determination became the final decision of the Commissioner.  See, Grissom v. Barnhart, 416 F.3d

834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson

v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §§404.981, and 416.1472.

## III.   Administrative Record

A.   Factual Background.  The Plaintiff was fifty-three (53) years old at the

time of the Hearing.  [T. 257].  She is a high school graduate, is right handed, and has

had previous work experience as a unit support staff person on the cardiac floor of

a hospital, and as an assembler of pace makers.  [T. 77, 82-87, 275].  The Plaintiff last

worked in 2003, for Allina Heath System.  [T. 60-65].  The Plaintiff alleges that she

cannot work full time due to an inability to sit or stand, for long periods of time, due

to foot and leg numbness, and additionally, she alleges problems with her back, leg,

and heart.  [T. 76, 93, 99-103, 261].

1.   Medical Records Before Alleged Onset Date of June 30, 2002.  On

October 30, 2001, the Plaintiff went to the emergency room of Mercy Hospital

complaining of dizziness, and mild to moderate lower abdominal pain.  [T. 106-08].

The examining physician, Dr. Manan Shukla, noted that the Plaintiff admitted using

laxatives, and diuretics, for weight-control. [T. 106].   Dr. Shukla discussed the

possibility that the Plaintiff had an eating disorder, and her family reported that she was

depressed.  Id.  As a result, Dr. Shukla ordered a psychiatric consultation.  Id.

- 3 -

A psychiatric evaluation was conducted by Dr. Yoshiko Hapke, on October 31, 2001, in order to assess the Plaintiff for a possible eating disorder. [T. 106, 110]. The Plaintiff reported significant use of laxatives, and also binging, and occasional purging, when she was alone. [T. 110]. The Plaintiff's sister, who was a nurse, stated that she believed that the Plaintiff was trying to kill herself by not eating, but the Plaintiff denied suicidal intent. Id. The Plaintiff reported low energy and concentration, and feelings of helplessness, and she did not eat during her hospital stay, but denied having an eating disorder. [T. 111]. The Plaintiff was prescribed Prozac,[2] and Seroquel,[3] and agreed to outpatient therapy. Id. A CT scan of the Plaintiff's head was normal and, on a mental status examination, Dr. Hapke noted that the Plaintiff was fully oriented with no acute distress, and her manner was somewhat tense, and shifted between being friendly and hostile. [T. 113]. Dr. Hapke additionally observed that, although the Plaintiff had a depressed affect and limited insight and judgment, her thoughts were

---

[2]Prozac is indicated in the treatment of major depressive disorder, obsessive compulsive disorder, bulimia nervosa, and panic disorder. Physician's Desk Reference, pp. 1772-73, 1875 (60th ed. 2006).

[3]Seroquel is indicated in the treatment of schizophrenia and acute manic episodes associated with bipolar disorder. Physician's Desk Reference, pp. 691, 1875 (60th ed. 2006).

well-organized, she had no hallucinations, delusions, or paranoia, and her higher cortical functioning, memory, and concentration, were intact.  Id.

Dr. Hapke diagnosed the Plaintiff with an eating disorder, major depressive disorder without psychotic features, and borderline personality disorder, and noted that she had a Global Assessment of Functioning ("GAF") score of 40.[4]  Id.  Dr. Hapke recommended that the Plaintiff be transferred to the psychiatric unit of the hospital, but the Plaintiff refused, and suggested, instead, that her husband could care for her.  Id.  Based on the Plaintiff's resistance to treatment Dr. Hapke concluded that a stay in the psychiatry unit would not be helpful. [T. 114].   The Plaintiff was discharged with advice to see Dr. Hapke, or another psychiatrist, in two (2) to three (3) weeks, and to see a dietician regarding her eating disorder.  [T. 106].

---

[4]The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships.  Id.

On November 25, 2001, the Plaintiff's husband brought her to the hospital after he found multiple packs of laxatives in her possession. [T. 154]. The Plaintiff stated that she took between twenty (20) to sixty (60) laxatives a day, but did not believe that she had a problem. Id. The Plaintiff's husband added that the Plaintiff had not begun outpatient therapy. Id. A medical examination of the Plaintiff was normal, and the Plaintiff was evaluated by a social worker with Crisis Intervention, who noted that the Plaintiff's behavior was relaxed, appropriate, and cooperative, that her mood was stable and depressed, her affect tearful, her speech stable, and her thought coherent. [T. 156]. The Plaintiff denied having depressive symptoms or suicidal ideation, and was fully oriented, neat in appearance, with poor insight and fair judgment. [T. 157]. The Plaintiff, and her husband, agreed that she would follow up with outpatient care for her eating disorder. [T. 155, 159]. The Plaintiff was discharged with a diagnosis of depression and bulimia. [T. 155].

From November of 2001, until June of 2002, the Plaintiff was seen repeatedly by Dr. Margo Hutchison for continued pain in her lower back, and her right leg, and for numbness in her upper thigh. [T. 190-203]. On repeated examination, she was found to be in mild to moderate distress when she walked, with negative straight leg raising, and her lumbar spine was moderately tender to palpitation. Id. During this

period, Dr. Hutchison restricted the Plaintiff to no lifting over five (5) to ten (10) pounds, no push/pull over twenty (20) pounds, with minimal twisting, turning, and bending at the waist, and work limited to six (6) to seven (7) hours a day.  Id.  Dr. Hutchison further recommended that the Plaintiff use a lumbar support pillow, continue her use of Tylenol, and ice or heat for pain, and consider using a TENS unit until she could be scheduled for surgery.  Id.

2.    Medical Records After The Alleged Onset Date of June 30, 2002. In October of 2002, the Plaintiff complained of incapacitating back pain, and pain radiating into her legs that did not respond to conservative treatment.  [T. 140-41]. She was admitted to the hospital for surgical treatment of lumbar stenosis, and was discharged in good condition, with instructions for limited activities and exercise to begin rehabilitation.  [T. 135-36].

On March 9, 2004, the Plaintiff was examined for complaints of back pain, accompanied by chronic right lateral leg and foot numbness that, she stated, were present since her surgery in October of 2002.  [T. 234].  The Plaintiff was discharged with pain medication, and referred to a back specialist.  [T. 235].

On August 29, 2005, the Plaintiff went to the emergency room complaining of decreased vision.  [T. 226].  Dr. Thomas Wyatt noted that a neurological examination

showed that the Plaintiff was alert, and oriented to person, place, and time, and a CT scan of her head was normal.  [T. 227].  Dr. Wyatt advised the Plaintiff to return to the hospital if she developed any other symptoms.  [T. 228].  On August 31, 2005, the Plaintiff underwent a neurological consultation with Dr. Daniel C. Randa, who observed that the Plaintiff was alert, pleasant, and cooperative, oriented to person, place and time, with intact memory.  [T. 240].  A motor examination showed excellent strength in the arms and legs, with no focal areas of weakness, atrophy or fasciculations, and symmetrical deep tendon reflexes.  Id.  Dr. Randa diagnosed the Plaintiff with restless leg syndrome, residual L5-S1 radiculopathy on the left, subsequent to her previous lumbar laminectomy and diskectomy, and recommended additional tests to address the etiology of her vision loss.  Id.

3.    Evaluations.   On August 6, 2002, the Plaintiff completed a questionnaire for rehabilitation services for her back, [T. 130], on which she noted that she had slight difficulty with eating and attention/concentration, but said that she had no concerns about her "emotional and physical safety at home."  [T. 131].  At that time, the Plaintiff reported that she was unable to push/pull or cook, and found it moderately difficult to sit, stand, sleep, drive a car, dress, reach, and perform yard

work, but had no difficulty managing time or money, speaking on the telephone, communicating, reading, or writing, or with her memory.  Id.

The Plaintiff underwent an RFC evaluation in October of 2002.  [T. 242-44]. The resulting report stated that the Plaintiff did not give maximum, consistent efforts in the tests, and concluded that, "[d]ue to the number of procedures that were self-limited due to subjective complaints of pain, objective measures to maximum capabilities are not possible."  [T. 242-44].  The examiner noted that the Plaintiff demonstrated a moderate loss of lumbar flexion, but was able to pick up a ten (10) pound weight during testing.  [T. 243].

On January 6, 2004, a State Agency employee, who was responsible for developing the Record, telephoned the Plaintiff to discuss the mention of laxative abuse, and possible depression in her old medical records.  [T. 69].  In that conversation, the Plaintiff confirmed that, in 2001, she had been admitted to the hospital for dehydration, after she had taken too many laxatives in an attempt to lose weight.  Id.  The Plaintiff added that she did not believe that the laxative overdose was a result of depression, but that it stemmed from poor judgment, and she denied any current problems with depression.  Id.  The Plaintiff also declined the opportunity to

attend a psychological Consultative Examination ("CE"), and asked that the State Agency process her claim on her physical impairments only.  Id.

The State Agency employee, who reviewed the Plaintiff's record, noted that the Plaintiff had not cooperated with psychological evaluations in 2001, although she had agreed to take medications temporarily.  Id. Also, in January of 2004, the Plaintiff underwent an RFC evaluation by a State Agency physician, who found that the Plaintiff was capable of full-time gainful employment, with some restrictions on back bending, and lifting.  [T. 212-19].

On January 6, 2004, State Agency psychologist, Dr. Sharon Frederiksen, reviewed the Record from the date of alleged onset to the present, in order to determine whether the Plaintiff had a mental impairment which met or equaled a Listed Impairment.  [T. 170].  Dr. Frederiksen concluded that the Plaintiff did not have a medically determinable mental impairment for that period of time.  [T. 170, 182].  Dr. Frederiksen wrote that the Plaintiff denied any trouble with depression, despite the medical records dating from 2001.  [T. 182].  On March 4, 2004, another State Agency psychologist, Dr. R. Owen Nelsen, affirmed Dr. Fredericksen's opinion. [T. 170].

Dr. Ahlberg, who was the Plaintiff's neurosurgeon, submitted two (2) letters for the Record. In the first, which is dated December 18, 2003, he reviewed the Plaintiff's record, and opined that she was capable of full-time gainful employment, with some restrictions on back bending, and on bending and lifting. [T. 222-23]. In the second letter, which was dated March 8, 2004, Dr. Ahlberg stated that, as of October 20, 2003, he did not feel that the Plaintiff was totally disabled from gainful employment, and opined that she could perform light work with no lifting greater than twenty-five (25) pounds, and with limits on bending and lifting. [T. 220].

4.    <u>Evidence Presented to the Appeals Council</u>. On May 9, 2006, the Plaintiff was seen by Dr. Paul M. Reitman for a psychodiagnostic assessment. [T. 249]. On examination, the Plaintiff stated that she was in constant pain, had difficulty with anger management, and she added that she occasionally heard her dead mother speak to her, and had to focus to respond to questions. [T. 250]. Dr. Reitman concluded that the Plaintiff was severely depressed, and suffered from anxiety and a mood disorder, and he opined that she was not malingering. [T. 251]. In reaching the conclusion that the Plaintiff was not capable of any type of gainful employment, Dr. Reitman noted that he had reviewed the Plaintiff's medical records, and interviewed

the Plaintiff, and found her to suffer from depression with a moderate to severe impact on her ability to concentrate, and on her long- and short-term memory.  [T. 252].

B.    Hearing Testimony.  The Hearing on September 26, 2005, commenced with some opening remarks by the ALJ, in which he noted the appearance of the parties for the Record.  [T. 272].  The ALJ asked the Plaintiff's attorney if he had any objections to the evidence being introduced into the Record, and the Plaintiff's attorney stated that he did not.  [T. 273].  Next, the ALJ asked the Plaintiff's attorney if he had any preliminary remarks, and he stated that he did not.  [T. 275].

The ALJ then swore the Plaintiff to testify, and began his questioning by asking the Plaintiff about her basic physical characteristics.  Id.  The Plaintiff stated that she was right-handed, stood five (5) feet, six (6) inches tall, and weighed one hundred and twenty-one (121) pounds.  Id.  The Plaintiff added that she was married, and lived with one child, who was nineteen (19) years old, that her spouse and child worked full time, and that she had no source of income.  [T. 275-76].  The ALJ asked the Plaintiff if she drove a car, and the Plaintiff stated that she did, but that, since she had her back surgery in October of 2002, she had problems sitting in a car for longer than three (3) blocks.  [T. 276-77].  The ALJ asked the Plaintiff to describe the back pain as she experienced it before, and after her surgery, and the Plaintiff replied that she had more

- 12 -

pain following her surgery, and she experienced constant numbness in her right leg and foot, but her physicians had not offered any treatment for those symptoms. [T. 277-78].

Next, the ALJ asked the Plaintiff about her education, and the Plaintiff testified that she completed high school. [T. 278].   In response to the ALJ's inquiry, the Plaintiff stated that she smoked approximately three (3) cigarettes a day, and did not use alcohol or drugs on a regular basis.   Id.   The ALJ asked the Plaintiff how far she could walk before having to stop, and the Plaintiff stated that she could walk for half a block before she experienced pain and began to stumble.   [T. 278-79].   The ALJ asked the Plaintiff if she used a cane or crutch, and the Plaintiff explained that she had a walker, that she used approximately three (3) times a month, but that no specific events precipitated her need for the walker, which was given to her after she had surgery on her back.   [T. 279].   The Plaintiff stated that she required the walker for support to rise from a seated position, as her low back pain made it difficult for her to get up, and she added that the pain did not diminish when she stood.   [T. 280].   The ALJ asked the Plaintiff if her back pain varied based on her activity level, and she testified that she experienced constant pain throughout the day, for which she took a

muscle relaxant.  [T. 280-81].  The ALJ then asked the Plaintiff if her pain had changed over the past year, and she testified that it had become worse.  [T. 281].

Then the ALJ asked the Plaintiff if she continued to experience limited vision in her left eye, and the Plaintiff testified that she did, and that her physician had told her that her vision would not improve.  [T. 281-82].  The Plaintiff added that she generally wore glasses to read, and for distance vision, but had not worn them to the Hearing because she could see the ALJ without them.   [T. 283].   In response to further inquiries by the ALJ, the Plaintiff explained that her glasses sharpened the visual acuity in her right eye, but did nothing for her left eye, and that she had been told by her physician that the bottom half of her left eye was "dead."  [T. 284].

Next, the ALJ asked the Plaintiff about notes in the Record for August of 2005, where she had experienced some difficulties with word-finding, and the Plaintiff stated that she continued to have problems expressing herself, as she experienced slurred speech, and lower lip numbness, but that no diagnosis had yet been made.  [T. 285]. The ALJ asked the Plaintiff about a history of smoker's bronchitis, which was noted in the Record from 2002, and the Plaintiff reported that this had improved since she had cut back on smoking.  [T. 286].

The ALJ asked the Plaintiff about her activities of daily living, and she testified that she was able to bathe and dress herself, prepare meals and wash dishes, but was not able to vacuum because of her back pain.  Id.  The Plaintiff added that her husband and son did most of the laundry, and that she could go to the grocery store when she was accompanied by her husband.  Id.

The Plaintiff's attorney then asked the Plaintiff about the work-related recommendations that Dr. Ahlberg had made to her following her back surgery in October of 2002.  [T. 287].  The Plaintiff explained that immediately before or after her surgery, Dr. Ahlberg had told her that she could not work but had not provided reasons for that prohibition.  Id.  Next, the Plaintiff's attorney asked her how long she could sit at a time, and the Plaintiff testified that, during an average day, she could sit for a little over an hour before she had to stand up and move around.  Id.  The Plaintiff added that on days when her back was troubling her, she had to recline in her chair, and she clarified that she was forced to lie back in a chair on a daily basis.  [T. 288].

The Plaintiff's attorney asked her how her back felt after sitting in an upright position for an hour, and the Plaintiff stated that her back pain was the same regardless of how long she sat.  Id.  The Plaintiff added that she could only stand for twenty (20) minutes at a time before she experienced severe back pain and began to stumble.  [T.

- 15 -

289].  The Plaintiff's attorney asked the Plaintiff if she was capable of lifting and carrying weights, and the Plaintiff stated that she could lift a gallon of milk, but nothing heavier.  Id.  In response to her attorney's inquiry, the Plaintiff explained that the most comfortable position for her was reclining in her chair, and that, on an ordinary day, she reclined for six (6) hours a day, and spent three (3) to four (4) hours in bed.  Id.  The Plaintiff explained that she ordinarily went to bed at 1:00 o'clock a.m., but had difficulty sleeping due to the pain in her back, and her restless leg syndrome, and added that it generally took her over an hour to fall asleep, and that she was only able to sleep for three (3) to four (4) hours at a time. [T. 289-90].  The Plaintiff stated that her restless leg syndrome caused her legs to "jump," and forced her to walk around, or recline in her chair.  [T. 290-91].

The Plaintiff's attorney asked her what she did when she was not reclining or sleeping, and the Plaintiff explained that the rest of the time she was preparing supper or washing dishes, or making her bed, but she stated that she could not make her bed all at once, because she became tired.  [T. 291-92].

Then the Plaintiff's attorney asked her about her former work manufacturing pacemakers, and asked her if she had been required to lift more than ten (10) pounds in that position.  [T. 292].  The Plaintiff stated that she had not, and noted that she

- 16 -

could not perform a job like that now, as it would require too much sitting. [T. 292-93]. The Plaintiff added that she could not sit at a job for six (6) hours out of an eight (8) hour work day, and testified that she additionally could not work a job where she had to stand for six (6) hours out of an eight (8) hour work day, as she would experience back pain. [T. 293]. The Plaintiff's attorney then asked the Plaintiff if she wanted to add anything, and she stated that her restless leg syndrome had not improved with medication. [T. 294]. The ALJ asked the Plaintiff about her medication, and the Plaintiff explained that she had taken Mirapex[5] for three (3) years, but that her physicians were still trying to find a medication that would help her. Id.

The Plaintiff's attorney then asked the Plaintiff about her admission to Mercy Hospital in October of 2001, when she spoke to a psychiatrist, and asked her if she had received any additional treatment for mental health issues. Id. The Plaintiff testified that she had been treated for depression by Dr. Randa, who prescribed Wellbutrin.[6] [T. 294-95]. The ALJ asked the Plaintiff if the medication had helped her

---

[5]Mirapex is "indicated for the treatment of the signs and symptoms of idiopathic Parkinson's disease." Physician's Desk Reference, p. 890 (60th ed. 2006).

[6]Wellbutrin "is indicated for the treatment of depression." Physician's Desk Reference, pp. 1579 (60th ed. 2006).

- 17 -

depression, and the Plaintiff replied that it had not, but that she had only been taking it for approximately three (3) months.  [T. 295].

The ALJ then swore the Medical Expert ("ME") to testify, and asked him if he had any questions for the Plaintiff.  [T. 295-96].  The ME asked the Plaintiff if she suffered from asthma, and she stated that she did.  [T. 296].  The ME next asked the Plaintiff about the surgery that she had on her back, and the Plaintiff explained that she had some discs fused in her back, but did not remember the date of that surgery.  Id.

The ALJ continued the Hearing by asking the ME to set forth the Plaintiff's impairments as he noted them from the interview.  Id.  The ME noted that the Plaintiff had been treated for low back pain, and had filed for workers' compensation in 2001. Id.  The ME reported findings of stenosis, and a 2LD compression that was performed in October of 2002 that healed satisfactorily, although a small herniation was seen at one level.  [T. 296-97].  The ME found that most of the neurological examinations of the Plaintiff had been unremarkable, that one examiner had found some sensory loss in the right leg and foot, but that there were no other weaknesses or reflex changes reported.  [T. 297].  The ME noted a diagnosis of restless leg syndrome, and also peripheral valve disease, asthma, and a cervical fusion, with no documentation to suggest that the Plaintiff suffered any residual limitations as a result.

- 18 -

Id.  The ME also noted the loss of vision in the Plaintiff's left eye was of unknown etiology, and there was a diagnosis of smoker's bronchitis, depression, borderline personality disorder, laxative abuse, and bulimia.  Id.

The ALJ asked the ME if he felt that any of those conditions were limiting, and the ME testified that they were not, and added that the Plaintiff's surgery appeared to have been successful, with no associated radicular neurological loss, and that the peripheral vascular disease had also been favorably addressed.  [T. 298].  The ME added that he had not addressed the Plaintiff's psychiatric conditions.  Id.

Next, the ALJ asked the ME what limitations he would impose, based upon the Record, and the ME stated that he would impose a light work level, with occasional bending, twisting, stooping, kneeling, crawling, crouching, and climbing, no hazardous equipment, and no high concentrations of air contaminants.  Id.  The ALJ asked the ME if there were any neck limitations based on the fusion in 1995, and the ME replied that the Record did not contain any information about that procedure, but that it appeared that it had fully healed and was stable.  [T. 299].  The ALJ then asked the ME about what limitations he would impose based upon the Plaintiff's leg stint, and the ME said that he believed that a light level of activity would accommodate the Plaintiff.  Id.

The ALJ then invited the Plaintiff's attorney to ask the ME questions, and he asked the ME about an MRI of the Plaintiff's spine that was taken in April of 2004. Id.  The ME testified that the MRI showed a small right central disc herniation, osteoarthritis, and some slight dorsal displacement of the right L3 nerve root, but added that those conditions would not necessarily cause pain, and nothing in the Record showed that the Plaintiff had any sensory or strength loss.  [T. 300].  The Plaintiff's attorney then asked the ME if the Plaintiff's complaints of pain were far in excess of what he would have expected, and the he replied that they were.  Id.  Next, the Plaintiff's attorney asked the ME if a full-scale mental health evaluation would give a clearer picture of the Plaintiff's impairments, given her history of depression.  Id.  The ME replied that he saw notes in the Record suggesting a diagnosis of depression, but was not sure how to answer the question.  [T. 301].  The Plaintiff's attorney then posed the following question: "If an individual presented to you with these types of objective findings and these types of pain complaints, would you recommend to that individual a psychiatric workup?"  The ME replied that he might, and the Plaintiff's attorney asked no further questions.  Id.

Next, the ALJ swore the VE to testify.  Id.  After affirming that the VE was familiar with jobs within the State of Minnesota, the ALJ asked the VE if he had any

questions for the Plaintiff.  [T. 302].  The VE replied that he did, and asked the Plaintiff about her work at the hospital.  Id.  The Plaintiff explained that she had worked in housekeeping, and had also worked with patients who had open-heart surgery, but was not a certified nursing assistant.  Id.  The ALJ then asked the VE if he wanted to make any changes to his report, and the VE stated that he found that the Plaintiff performed the duties of a nursing assistant, and also worked as a janitor/cleaner, which was medium, unskilled work.  [T. 303].

Next, the ALJ posed a hypothetical to the VE, in which he asked the VE to assume a female individual with a twelfth grade education, who was between fifty (50) and fifty-three (53) years old, with past work experience as set out in the VE's report, and with the impairments noted in the Record.  Id.  The individual was limited to light work, lifting no more than twenty (20) pounds occasionally, and ten (10) pounds frequently, and standing for six (6) to eight (8) hours a day, with no more than occasional bending, twisting, stooping, kneeling, crawling, crouching and climbing, and no hazardous equipment or high concentrations of air contaminants.  [T. 303-04].  The ALJ asked the VE if such an individual could perform the Plaintiff's past relevant work. [T. 304].

The VE replied that he believed that the individual could perform the individual's past relevant work performing pacemaker assembly, as that work was performed at the sedentary level. <u>Id.</u> Next, the ALJ amended the hypothetical, and asked how the VE's testimony would be affected if the individual were restricted to semiskilled or unskilled work, with no high production goals. <u>Id.</u> The VE stated that the individual would be more limited, but could still work in production assembly, either assembling pacemakers, or small products, such as electronics components. [T. 304-05]. The VE then asked the Plaintiff if her work in assembling pacemakers had been performed on an assembly line, and she confirmed that it had been, and that she sat with a tool, and reamed plastic out of the pacemakers, while the components passed in front of her. [T. 305]. The ALJ then asked the VE about the purpose of that question, and the VE explained that, ordinarily, moving assembly lines required high production quotas, or high performance. <u>Id.</u>

The ALJ then asked the VE how his testimony would change if the individual in the hypothetical were not able to sit for an extended period, but required a sit/stand option, in which she could be in either position for up to fifty (50) or sixty (60) minutes at a time, before needing a brief change from that position, and the VE replied that it would not be possible for the individual to perform the Plaintiff's past relevant

work.  Id.  The VE explained that the Plaintiff's position, at the hospital, required her to be on her feet for most of the day, and the assembly work required sitting for most of the work day, with no ability to stand at her discretion.  [T. 307].    Next the Plaintiff's attorney asked the VE how his testimony regarding the first hypothetical would change if the individual was limited to sitting for one (1) hour at a  time, and then needed to recline for an extended period of time, could only stand for twenty (20) minutes at a time, and was limited to lifting ten (10) pounds.  Id.  The VE testified that a person with those limitations would not be able to perform any work, including the Plaintiff's past relevant work.  Id.

The ALJ then asked the Plaintiff's attorney if he wished to make a closing statement, and he stated that, based on the testimony at the Hearing, he was going to request a Consultative Examination ("CE"), or ask for permission to schedule such an examination on his own.  [T. 308].  The ALJ acknowledged that, as evidenced by the ME's testimony, "there [were] some bases for psychiatric impairments here," that had not been well-developed, and he noted that he "normally used CEs to resolve inconsistencies * * * as opposed to actually creat[ing] a record."  Id.  The ALJ then allowed the Plaintiff's attorney to have six (6) weeks in which to arrange for a CE, and the Plaintiff's attorney agreed to that schedule.  Id.

- 23 -

C.   <u>The ALJ's Decision</u>.   The ALJ issued his decision on December 16, 2005.  [T. 19-28].  As he was required to do, the ALJ applied the sequential, five-step analytical process, that is prescribed by 20 C.F.R. §§404.1520 and 416.920.[7]  As a threshold matter, the ALJ noted that, on October 30, 2003, the Plaintiff had filed a protective application for DIB and, on the same date, had also filed an application for

---

[7]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

<u>Simmons v. Massanari</u>, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  <u>Id.</u> at 754.

- 24 -

SSI.[8]  [T. 19].  The ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 30, 2002.  [T. 21].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise her ability to engage in gainful work activity.  Id.  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by a history of degenerative disc disease of the lumbar spine, status post-decompression; a history of degenerative disc disease of the cervical spine, status post-fusion; peripheral vascular disease, status post-repair with stenting; visual loss in the left eye in the lower lateral quadrant; asthma; restless leg syndrome; a history of bulimia and laxative abuse; a depressive disorder; and a borderline personality disorder.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d), and 416.920(d).  The ALJ determined that the Plaintiff's physical and

---

[8]The documents in the Record suggest that the Plaintiff's application was filed, in fact, on November 25, 2003, see, [T. 257-58], rather than on October 30, 2003. However, we find that this is a minor clerical error, and does not materially affect our analysis of the ALJ's decision.

mental impairments did not meet, or equal, the criteria of any Listed Impairment, based upon the testimony of the ME, and the Record as a whole.  [T. 22].

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by her past relevant work, or whether she was capable of engaging in other work which existed in significant numbers in the national economy.  Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, Title 20 C.F.R. §§404.1545, and 416.945, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §§404.1529 and 416.920(a).

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the opinions of the impartial ME; the objective medical evidence; and the Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

- 26 -

> [The Plaintiff] has the residual functional capacity to perform light work; with lifting 20 pounds occasionally and 10 pounds frequently; standing and walking for up to 6 hours out of an 8 hour day; sitting for up to 6 hours out of an 8 hour day; with only occasional bending, stooping, crouching, crawling, twisting, kneeling, and climbing; no hazardous equipment or machinery; no high concentrations of air contaminants; performing tasks that are unskilled to low semi-skilled in nature; and with no high production goals.

Id.

In determining the Plaintiff's RFC, the ALJ evaluated the physical and mental impairments using the procedures set out in 20 C.F.R. §§404.1520a, and 416.920(a). Id. The ALJ noted that he had carefully considered the entire Record, including the testimony of the Plaintiff, and found that the Plaintiff would experience mild restrictions in activities of daily living. [T. 22-23]. As noted by the ALJ, the Plaintiff testified that she drove a car, groomed and bathed herself, cooked, washed dishes, and made her own bed, and further, no significant limitations on the Plaintiff's functioning were documented in the Record. [T. 23].

Next, the ALJ found that the Plaintiff would experience mild restrictions in social functioning, as the Record did not document that she had any significant difficulties interacting with others when she was working, with her family members, or in any social interactions. Id. The ALJ determined that the Plaintiff would experience

moderate restrictions in maintaining concentration, persistence, and pace.  Id.  Dr. Wyatt stated, in treatment notes from August of 2005, that the Plaintiff was alert and oriented, and examination notes from Dr. Randa, as to the same month, reported that the Plaintiff's recent and remote memory was intact.  Id.  Although there was no documentation in the Record, that the Plaintiff experienced serious difficulties with attention, concentration, persistence, and pace, or had experienced any episodes of decompensation, the ALJ gave the Plaintiff the benefit of all reasonable doubt, and found that she was moderately restricted, secondary to her depressive disorder.  Id.

The ALJ observed that treatment notes, from October of 2001, reported that the Plaintiff had been abusing laxatives, and diuretics, in an attempt to lose weight, and that she was impaired by restless leg syndrome, and a history of chronic low back pain. Id.  Hospital discharge notes, from the same month, recorded that the Plaintiff was impaired by an eating disorder and depression, and that the Plaintiff had declined a referral to a psychiatric unit for an evaluation.  Id.  The ALJ also considered treatment notes, from September of 2002, that recorded the Plaintiff's complaints of low back pain, with her lumbar spine moderately tender to palpitation.  Id.  The Record reflected that, although surgery was considered by the Plaintiff's physicians, the Plaintiff's

physician told her that she was able to return to work, and perform the duties outlined by her employer.  Id.

The ALJ also considered an RFC evaluation that the Plaintiff underwent in October of 2002, in which the evaluator stated that the Plaintiff did not give maximum or consistent effort during testing, as she refused to perform some activities, and self-limited secondary to reports of pain.  Id.  The RFC evaluator concluded that an objective evaluation of the Plaintiff's maximum capabilities was not possible, since she had self-limited during testing.  [T. 24].

As noted by the ALJ, x-rays of the Plaintiff's lumbar spine, in October of 2002, revealed lumbar stenosis at L-3-4, and L4-5, and the examining physician noted that conservative treatment had failed, as the Plaintiff continued to complain of incapacitating back pain that radiated into her legs, and expressed a desire to pursue surgical treatment.  Id.  The Plaintiff subsequently underwent a bilateral L4-5 lumbar foraminotomy/facetectomy, a bilateral L3-4 lumbar foraminotomy/facetectomy, and a lumbar spine microdissection, and discharge notes recorded that the surgery took place without complications.  Id.  The Plaintiff again reported back pain in May of 2003, and an x-ray was performed that revealed laminectomy defects at L4 and L5, but

showed normal alignment in the lateral projection, some anterior spurring and disc space narrowing, but no fractures.  Id.

In examination notes from October of 2003, the Plaintiff stated that her back symptoms had initially been helped by surgery, but that they had since returned.  Id. The treating physician noted that the Plaintiff had recently settled a workers' compensation lawsuit, but was unsure if she could return to work.  Id.   On examination, the Plaintiff's physician found that the Plaintiff's lumbar posture was normal, her lumbar incision was well-healed, and there was no pelvic tilt or list.  Id. The Plaintiff's range of motion was performed with great hesitation, as she would only flex to five (5) degrees, but straight leg raising was unremarkable, and there was no swelling, tenderness, or abnormalities noted in her lower extremity joints, and the range of motion, in all of her lower extremity joints, appeared to be bilaterally normal.  Id. As considered by the ALJ, the Plaintiff's neurological examination revealed no atrophy or fasciculations, her confrontation strength, and tone testing, did not show any focal weaknesses, her reflexes were symmetrical at the knees and ankles, and her sensation appeared to be fairly intact.  Id.

The ALJ additionally considered a letter in the Record, by one of the Plaintiff's treating physicians, which was dated December 18, 2003, and which recorded that she

had undergone an anterior cervical fusion procedure, in February of 1993, secondary to cervical degenerative disc disease, and that she had made a good recovery from that procedure, and had additionally made a good recovery from her lumbar decompression, in October of 2002, despite the fact that she continued to complain of back pain.  Id.  During an examination, on October 20, 2003, the Plaintiff complained of back pain that was aggravated by activity and fatigue, but her musculoskeletal and neurological examinations were intact, with no evidence of significant or progressive spine or neurological deficit.  Id.  The Plaintiff never returned for recommended further studies, or follow-up neurological evaluation.  [T. 24-25]. The examining physician stated that the Plaintiff had a chronic low back syndrome, with no significant musculoligmentous instability or neurological defect, and opined that the Plaintiff was capable of full-time gainful employment, with some restrictions on bending and lifting.  [T. 25].

In a letter dated March 8, 2004, Dr. Ahlberg stated that the Plaintiff was not disabled from full-time employment, and was capable of performing work that involved lifting no more than twenty-five (25) pounds, with only occasional bending and lifting.  Id.

The ALJ also noted that, in treatment notes dated March 9, 2004, Dr. Dvorak reported that the Plaintiff complained of lower back pain and, on examination, exhibited moderate tenderness over the lumbar spine, but appeared fairly comfortable at rest, with full motor strength in the quadriceps, hip flexors, on plantar flexion, and on dorsi-plantar flexion bilaterally, with only some mild limitation on the right secondary to pain.  Id.  Dr. Dvorak additionally found that the Plaintiff's reflexes were symmetric, sensation was intact to light touch in both legs, and that straight leg raising increased the Plaintiff's low back pain at thirty (30) degrees, but did not produce radiation.  Id.

X-rays of the Plaintiff's lumbar spine, in April of 2004, revealed a very small ventral disc herniation, with evidence of previous decompressions, but the central spinal canals were normal at both levels.  Id.  A radiology report, from April of 2005, reported evidence of the laminectomy previously performed on the Plaintiff's lumbar spine, moderate narrowing at the L3-4 disc space with adjacent endplate sclerosis and spur formation, mild narrowing at the L2-3 disc space, and mild degenerative retrolisthesis of the L2 disc space relative to L3.  Id.  The radiologist also stated that the flexion and bending views did not show any significant subluxation, and that no bony abnormality was identified.  Id.

Examination notes of August 31, 2005, by Dr. Randa, reported that the Plaintiff's sensory examination revealed some subjective hypesthesia, in the right lower extremity, but that her deep tendon reflexes were symmetric, and no Babinski reflex was present, and the Plaintiff's motor examination revealed excellent strength in her arms and legs, with no focal areas of weakness, atrophy, or fasciculations. Id. Dr. Randa concluded by noting that the Plaintiff performed hopping, tandem walking, and tandem standing well, and that her station, and gait, were normal. Id.

The ALJ also considered the ME's testimony, that the Plaintiff's vascular disease had been successfully addressed, her lumbar surgery had been successful, and that the Record did not document that the Plaintiff experienced any ongoing neurological losses, or radiculopathy. Id. The ME also testified that there was no evidence, in the Record, that the Plaintiff experienced any ongoing weakness or reflex changes, and her neurological examinations had been mostly normal. [T. 26]. The ME determined that the Plaintiff did not experience any residual limitations subsequent to her cervical fusion, and opined that she was capable of performing work at the light exertional level. Id.

The ALJ noted that, while the Plaintiff alleged that she was unable to work as a result of chronic low back pain, with lower extremity radiation and restless leg

syndrome, the Record documented that her symptoms improved following her lumbar decompression surgery, her neurological examinations had been mostly normal, and she had not experienced any ongoing neurological losses, weaknesses, or reflex changes.  Id.  In addition, the ALJ found that the Plaintiff did not follow through with the recommendations of her neurosurgeons, for further evaluation of her back symptoms, and only minimal ongoing conservative treatment of her back was documented in the Record.  Id.

The ALJ further noted that the Plaintiff refused a psychiatric evaluation when she was hospitalized, and had not sought, or received, any ongoing treatment for psychological symptoms and, additionally, had refused to be seen for a psychological CE as a part of her disability evaluation.  Id.  As a consequence, the ALJ concluded that the Record did not document that the Plaintiff had experienced significant, ongoing, psychological symptoms.  Id.

The ALJ arrived at the Plaintiff's RFC after considering the opinions of the State Agency physicians, who had reviewed the Record, and to whom he gave some weight, insofar as they concluded that the Plaintiff was capable of working.  Id.  However, the ALJ did not adopt those opinions in their entirety, as the ALJ further reduced the RFC in order to reflect the Plaintiff's subjective complaints.  Id.  The ALJ

also considered the opinion of Dr. Ahlberg who stated, in October of 2002, that the

Plaintiff's attempt to return to light duty work had failed, but did not give that opinion

significant weight as Dr. Ahlberg did not state that the Plaintiff would not be able to

work for an extended period of time, and Dr. Ahlberg later stated that the Plaintiff was

able to return to competitive full time employment.  Id.

In addition, the ALJ gave some weight to the opinion of Dr. Hutchison, who

stated that the Plaintiff was limited to lifting ten (10) pounds, could not push or pull

over twenty (20) pounds, could perform only minimal twisting, turning, or bending at

the waist, and could work for only six (6) to seven (7) hours a day.  Id.  The ALJ

noted that Dr. Hutchison's opinion was drawn before the Plaintiff had her successful

lumbar surgical treatment, and that the period of time, which was addressed by Dr.

Hutchison's limitations for the Plaintiff, was not consistent with a finding of disability.

[T. 27].

The ALJ also considered Dr. Ahlberg's opinion, from December of 2003, that

the Plaintiff was capable of full time gainful employment, with some restrictions in

bending and lifting, and his opinion, from March of 2004, that the Plaintiff was capable

of performing work that involved lifting no more than twenty-five (25) pounds, with

occasional bending and lifting.  Id.  The ALJ gave those opinions significant weight,

as they were consistent with the objective medical evidence, and with the other opinions in the Record.  Id.

Finally, the ALJ considered the ME's opinion that the Plaintiff was capable of light work.  Id.  The ALJ gave that opinion significant weight because it was consistent with the objective evidence in the Record, and because the ME's opinion was largely consistent with the opinion of Dr. Ahlberg, who was the Plaintiff's treating neurosurgeon.  Id.

The ALJ also considered the Plaintiff's medications, and noted that nothing in the Record suggested that the Plaintiff ever complained about ongoing side effects from medications.  Id.  In addition, the Plaintiff's work history suggested that, in some years, she worked full time and, in other years, part time or not at all, which suggested that the Plaintiff might lack an interest in full time employment.  Id.  Based upon his findings, the ALJ found that the extent of the Plaintiff's subjective complaints, and her alleged limitations, were not entirely credible.  Id.

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff was capable of performing her past relevant work as a small products assembler, which did not require the performance of work-related activities that were precluded by the Plaintiff's RFC.  Id.  Specifically, the ALJ noted that the Plaintiff had past relevant work as a

small products assembler, which was light unskilled work, as a nurse assistant, which was medium semi-skilled work that was performed at a heavy exertional level, and as a janitor cleaner, which was medium unskilled work. Id. The VE testified that, given the Plaintiff's RFC, she could perform her past relevant work as a small products assembler, and the ALJ accepted that testimony, and concluded that the Plaintiff was able to perform her past relevant work. [T. 28].

## IV. Discussion

A.    Standard of Review.    The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial

evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004);

Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.   See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.   See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.   See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v.

Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.    Legal Analysis.   In support of her Motion for Summary Judgment, the only issue raised by the Plaintiff is her assertion that the ALJ failed to develop the Record by ordering a psychological CE, so as to determine whether the Plaintiff suffered from a disabling mental impairment.   See, Plaintiff's Memorandum, Docket No. 9, at 7.

1.    Standard of Review.   It is well-established that "[a] social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."   Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); Walz v. Barnhart, 2004 WL 742042 at *4 (D. Minn., March 31, 2004) .   The duty of the ALJ is applicable, even where, as here, an individual is represented by legal counsel.   See, Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003), citing Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992). However, "'an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"   Warburton v. Apfel, 188 F.3d1047, 1051 (8th Cir. 1999), quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994); Barrett v. Shalala, 38 F.3d

1019, 1023 (8th Cir. 1994)("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."); cf., Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004)(an ALJ must order a CE if "the available evidence does not provide an adequate basis for determining the merits of the disability claim"). Thus, the right to a post-Hearing CE exists only where a Plaintiff's medical sources cannot, or will not, provide sufficient medical evidence to allow a determination as to whether the Plaintiff is disabled.  See, 20 C.F.R. §416.917.

    2. Legal Analysis.  The Plaintiff argues that the ALJ erred by failing to order a CE so as to develop the Record concerning any possible mental impairments, and suggests that multiple notations, in her medical records, as well as the opinion of the ME at the Hearing, supports her position that she is disabled by depression and bulimia.  In addition, she argues that the post-Hearing report of Dr. Reitman confirmed that she was suffering from significant mental impairments.

  We cannot agree with the Plaintiff's contention that the ALJ erred by failing to order a CE so as to weigh the possibility that the Plaintiff suffered from a mental impairment.  In reaching his decision, the ALJ expressly considered whether the Plaintiff was subject to any severe physical or mental impairments, and found that she

was impaired by a history of degenerative disc disease of the lumbar spine, status post

a decompression; a history of degenerative disc disease of the cervical spine, status

post a fusion; peripheral vascular disease, status post repair with stenting; visual loss

on the left in the lower lateral quadrant; asthma; restless leg syndrome; a history of

bulimia and laxative abuse; a depressive disorder; and a borderline personality

disorder.  [T. 21].

Later in his decision, the ALJ specifically considered the Plaintiff's impairment

due to a major depressive disorder, and borderline personality disorder.  [T. 22].  As

he was required to do, the ALJ painstakingly assessed the Plaintiff's severe mental

impairments according to the specialized framework for that purpose.  See, 20 C.F.R.

§§404.1520a, and 416.920a.  After considering the entire Record, including the

Plaintiff's testimony, the ALJ found that the Plaintiff was subjected to mild restrictions

of daily living, as she testified that she could drive a car, groom and bathe herself,

cook, wash dishes, and make her bed, and noted that no further limitations, in her

functioning, were included in the medical records.  [T. 23].  Next, the ALJ found that

the Plaintiff was mildly limited in social functioning and, again, noted that nothing in

the Record suggested that she had any significant difficulties in interacting with others,

either in the workplace, or with friends or family.  Id.

In finding that the Plaintiff would experience moderate limitations in maintaining concentration, persistence, and pace, the ALJ considered the treatment notes of Dr. Wyatt, from August of 2005, which recorded that the Plaintiff was alert and oriented, and the examination notes, from the same month by Dr. Randa, who also found the Plaintiff to be alert and oriented, with intact recent and remote memory.  Id.  Although the ALJ found no documentation, in the Record, that the Plaintiff experienced any difficulties with concentration, persistence, and pace, he gave the Plaintiff the benefit of the doubt, and reduced her RFC accordingly.  Id.  Finally, the ALJ noted that there were no reports which would suggested that the Plaintiff had experienced episodes of decompensation.  Id.

In addition, the ALJ considered treatment notes, from October of 2001, when the Plaintiff was admitted to the hospital for abuse of laxatives, and diuretics, in an attempt to lose weight.  Id.  As noted by the ALJ, the Plaintiff refused to be transferred to the psychiatric unit for an evaluation, and was discharged with a diagnosis of an eating disorder, and depression, id., and nothing in the Record demonstrated that the Plaintiff had ever sought, or received, any ongoing treatment for psychological symptoms.  [T. 26].  Further, the Plaintiff refused to be seen for a psychological CE,

as a part of her disability evaluation by the State Agency and, in her application for

DIB, and SSI, she did not allege a disability due to any mental impairment.  Id.

An ALJ is only required to order a CE when it is necessary for an informed

decision, see, Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000), and the ALJ has

fulfilled his duty to develop the Record so long as there is evidence, from a treating

or examining physician, that addresses the particular impairments at issue.   See,

Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004).  Moreover, our Court

of Appeals has recognized that the failure to seek treatment may be considered to be

inconsistent with a disability.  Cf., Camp v. Barnhart, 186 Fed.Appx. 696, 696 (8th Cir.

2006), citing Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Edwards v.

Barnhart, 314 F.3d 964, 967 (8th Cir. 2003), citing Comstock v. Chater, 91 F.3d 1143,

1147 (8th Cir. 1996); Banks v. Massanari, 258 F.3d 820, 825-26 (8th Cir. 2001.

In  Khalil v. Barnhart, 58 Fed.Appx. 238, 239 (8th Cir. 2003), the Court found

no error in an ALJ's refusal to order a CE, with a psychologist, for a claimant who had

first sought treatment for depression the month before his Hearing, and first alleged

that he was impaired by depression at the Hearing.  See also, Smith v. Shalala, 987

F.2d 1371, 1375 (8th Cir. 1993); cf., Norfleet v. Massanari, 16 Fed.Appx. 535, 536 (8th

Cir. 2001).  Under the circumstances presented here, we see little to commend the ALJ

to schedule a psychological CE.  The Plaintiff's medical records reveal treatment for

psychological symptoms on two (2) occasions -- in October and November of 2001,

both prior to her date of disability onset -- and she underwent no followup assessment

until she saw Dr. Reitman nearly five (5) months after the ALJ had issued his denial of

benefits decision.  This seems particularly enigmatic, given the leave granted to the

Plaintiff to present medical evidence of a psychiatric, or psychological consult, if she

thought one appropriate, for presentation to the ALJ.  As we earlier noted, the Plaintiff

had previously declined, in January of 2004, the State Agency's offer of a

psychological CE.  [T. 69].

Fairly assessed, Dr. Reitman's report[9] is a collateral attack on the ALJ's

decision and, notwithstanding the paucity of treatment notes that document that the

---

[9]The Plaintiff represents that "Dr. Reitman conducted a clinical interview and administered objective testing."  Plaintiff's Memorandum, Docket No. 9, at p. 5. However, Dr. Reitman's report does not disclose any objective psychological testing, and acknowledges the subjectiveness of his interviewing of the Plaintiff. [T. 251] ("Subjective interviewing reveals a woman who has experienced memory loss, impairment in [hereafter the sentence ends abruptly])."  Dr. Reitman does suggest that, in reaching the Plaintiff's diagnosis, he applied a "bio-psycho-social model," [T. 253], but he never discloses the identity, reliability, or confidence quotient, in such a "model."  Rather, it appears that Dr. Reitman interviewed the Plaintiff and, necessarily, accepted all of her complaints as true, which plainly is devoid of an objective component.

- 45 -

Plaintiff suffered from psychological symptomatology -- apart from the previously referenced two (2) hospitalizations in 2001 -- at the time that she presented herself to Dr. Reitman, the Plaintiff, for the first time in this Record, claimed to be suffering from hallucinations -- the seeing of shadows, as well as hearing calls from her deceased mother. [T. 250]. There is nothing in Dr. Reitman's report that suggests the hallucinations were a longstanding presence, and the Record, apart from Dr. Reitman's report, contains only denials of hallucinations. [T. 113, 156]. Similarly, the Plaintiff complained of impaired memory to Dr. Reitman, but her memory was previously found to be intact in October of 2001, and in August of 2005. [T. 113, 240]. Further, the Plaintiff told Dr. Reitman that she held suicidal ideations, which she had previously denied in the Record before the ALJ. [T. 157].

Given the somewhat stark differences between the Plaintiff's statements to Dr. Reitman, and the Record before the ALJ, and notwithstanding our close review of Dr. Reitman's report, we are unable to conclude that his opinions, insofar as they differ with those of the ALJ, relate to the period of disability at issue here. As the Court recently explained, in <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1026 (8th Cir. 2007), where the Court was also considering a denial of DIB, and SSI:

The Appeals Council will consider new evidence if it is
material to the issue decided by the ALJ.   20 C.F.R.
§404.970(b).   Evidence is material if it is "relevant to
claimant's condition for the time period for which benefits
were denied." Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th
Cir. 2000).   Here the Appeals Council concluded that the
new records described Ms. Roberson's condition on the
date that the records were prepared, not on an earlier date,
and were therefore not material; it notified Ms. Roberson
that the records would not be considered but that she could
file a new claim if her condition had worsened since the ALJ
made his decision.   Medical conditions can, of course,
provide information about a claimant's condition on an
earlier date, see Cunningham v. Apfel, 222 F.3d 496, 502
(8th Cir. 2001), but we have reviewed the records here and,
though we believe that the question is close, we cannot say
that the Appeals Council erred in concluding that all the new
records referred to Ms. Roberson's condition after April
26, 2004, when the ALJ issued his decision.

Notably, on appeal, the Plaintiff does not now argue that we should reverse the ALJ's
decision, and award benefits to her, because of the opinions drawn by Dr. Reitman;
she solely argues that Dr. Reitman's report corroborates the need for the ALJ to have
scheduled a psychological CE.

Nevertheless, even if we presumed that Dr. Reitman's opinions were relevant
to the period of disability at issue here, we would not be persuaded that those opinions
demonstrate any error on the ALJ's part in not directing the conduct of a
psychological CE.   By the close of the Hearing, the Record contained sufficient

medical evidence for the ALJ to make an informed decision as to the Plaintiff's claimed mental impairments, and the ALJ considered records, from the Plaintiff's treating physicians, in October and November of 2001, that she suffered from depression and bulimia, and additionally noted that, although the Plaintiff had agreed to take medications for depression, she refused to be transferred to the psychiatric unit for a full evaluation, and further declined to participate in outpatient therapy that had been recommended for her.

Nothing in the medical records, after November of 2001, suggested that the Plaintiff had sought, or received, treatment for any mental impairment, and the Plaintiff specifically declined to be evaluated by the State Agency consultants concerning her past diagnoses of depression and bulimia, and did not apply for SSI, or DIB, for those alleged disabilities.  See, 20 C.F.R. §416.918(a)("If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability or blindness, we may find that you are not disabled or blind.").

The Plaintiff quotes from a footnote to Social Security Ruling 96-7p, which states that an ALJ "must develop evidence regarding the possibility of a medically determined mental impairment when the record contains information to suggest that

such an impairment exists, and the individual alleges pain or other symptoms, but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms." Social Security Ruling 96-7p, n. 3. Here, however, the ALJ complied with that directive, and found that the Plaintiff suffered from depression, and a borderline personality disorder, assessed the Plaintiff's symptoms according to the Listings, and adjusted the Plaintiff's RFC accordingly. While, during questioning by the Plaintiff's attorney at the Hearing, the ME agreed that he "might" recommend a CE in order to assess the mental impairments of an individual who presented pain complaints in excess of what would be anticipated under normal circumstances, [T. 300-01], contrary to the Plaintiff's argument, the ME did not recommend that a CE be ordered, and it was proper for the ALJ to decline to order a CE based upon the ME's neutral comment, under the circumstances presented here.

As we previously noted, even though the ALJ allowed the Plaintiff six (6) weeks, after the close of the Hearing, to submit the results of a CE, [T. 308], the Plaintiff first submitted Dr. Reitman's report to the Appeals Council, on May 9, 2006, [T. 249-53], which was nearly five (5) months after the ALJ issued his decision. By electing to circumvent the ALJ -- and no other reason for such a delay in the Plaintiff's

examination by Dr. Reitman presents itself in this Record -- we are placed in the awkward position of attempting to determine how the ALJ would have addressed Dr. Reitman's report.  As noted, under 20 C.F.R. §404.970(b), the Appeals Council must consider new and material evidence that relates to the period on or before the date of the ALJ's Hearing decision, and then review the ALJ's decision in light of such evidence.  See, 20 C.F.R. §404.970; Roberson v. Astrue, supra at 1026.  Here, the Appeals Council considered Dr. Reitman's report, as well as the rest of the evidence of Record, and found no reason to alter the ALJ's decision.  [T. 5-6].

Once it is clear that the Appeals Council considered additional evidence, we must determine if the ALJ's decision is still supported by substantial evidence in light of that new evidence, by determining how the ALJ would have weighed that evidence if it had been presented at the Hearing.  See, O'Donnell v. Barnhart, 318 F.3d 811, 815 (8th Cir. 2003)(citing cases); Flynn v. Chater, 107 F.3d 617, 622 (8th Cir. 1997); Mackey v. Shalala, 47 F. 3d 951, 953 (8th Cir. 1995).  Dr. Reitman found, on examination, that the Plaintiff suffered from a major depressive disorder that was moderate to severe, and an anxiety disorder, and concluded that the Plaintiff was "simply unable to engage in any type of competitive employment."  Id.

However, the only evidence that would clearly relate to the period, on or before the date of the ALJ's decision, is that information that was derived from Dr. Reitman's review of the Plaintiff's medical records.   Notably, Dr. Reitman recognized that the Plaintiff had "not participated in outpatient treatment" for psychological symptoms. [T. 250].   On the same historic information, upon which Dr. Reitman relied, the ALJ specifically assessed the impact that the Plaintiff's depression would have on her ability to concentrate and, although he found no support in the Record, he reduced her RFC accordingly, in deference to her subjective complaints, and found that she was moderately impaired.   [T. 23].

To the extent that Dr. Reitman's subjective assessment of the Plaintiff's complaints varied with that of the ALJ, or of the other medical sources of Record, the ALJ was under no obligation to abdicate his factfinding function in deference to the one-time consultative interview of Dr. Reitman.   See, e.g., Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)("By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'"), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).   More importantly, insofar as the information, which is contained in Dr. Reitman's report, includes evidence which is unquestionably

- 51 -

relevant to the Plaintiff's period of disability, and does not reflect a post-decisional aggravation of her psychological state, it is not meaningfully distinguishable from that considered by the ALJ, and would not counsel the conduct of a psychological CE.

In sum, while there may be some evidence in the Record, that the Plaintiff had been diagnosed with depression and bulimia, an ALJ's decision is not subject to reversal "merely because substantial evidence would have supported an opposite conclusion." Khalil v. Barnhart, supra at 240, quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Therefore, finding no error in the ALJ's decision, that has either been drawn to our attention, or uncovered by our independent review, and specifically concluding that the ALJ did not err in declining to schedule a psychological CE, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1.    That the Plaintiff's Motion [Docket No. 8] for Summary Judgment be denied.

2.    That the Defendant's Motion [Docket No. 15] for Summary Judgment be granted.

Dated: July 17, 2007                    s/Raymond  L. Erickson

                                        Raymond L. Erickson
                                        CHIEF U.S.  MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.2(b), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties by no later than **August**

**2, 2007**, a writing which specifically identifies those portions of the Report to which

objections are made and the bases of those objections.  Failure to comply with this

procedure shall operate as a forfeiture of the objecting party's right to seek review in

the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing by no later than **August 2, 2007**, unless all interested parties

stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the

transcript in order to resolve all of the objections made.

- 53 -